## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| JACQUELINE AHLERS, CATHY GEBHARDT-LALLY and PATRICK WITT, *individually, and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> ALLINA HEALTH SYSTEM, <br><br> Defendant. | **Case No. 0:24-cv-03674-SRN-ECW** <br><br><br> **COMPLAINT – CLASS ACTION** <br><br><br> **JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Jacqueline Ahlers, Cathy Gebhardt-Lally and Patrick Witt, ("Plaintiffs") bring this class action lawsuit individually and on behalf of all others similarly situated, by and through undersigned counsel, and hereby alleges the following against Defendant Allina Health System ("Allina Health", "SFR" or "Defendant"). Facts pertaining to Plaintiffs and their experiences and circumstances are alleged based upon personal knowledge, and all other facts alleged herein are based upon investigation of counsel and—where indicated—upon information and good faith belief.[1]

## PARTIES

1.    Plaintiff Jacqueline Ahlers is, and at all relevant times was, an individual residing in Dellwood, in the State of Minnesota.

---

[1] At the time of this filing, Plaintiffs Cathy Gebhardt-Lally and Patrick Witt are plaintiffs in a similar action that was removed to this Court, *Gebhardt-Lally et al. v. Allina Health System et al.*, Case No. 0:24-cv-04100. As contemplated by the joint motion of the parties filed in the instant matter on January 17, 2025, ECF. No. 27, ¶¶ 4-7, following the filing of this Amended Complaint the *Gebhardt-Lally* plaintiffs will promptly file a stipulation of dismissal in the *Gebhardt-Lally* action, and only this action will remain.

2.      Plaintiff Cathy Gebhardt-Lally is, and at all relevant times was, an individual residing in Shakopee, in the State of Minnesota.

3.      Plaintiff Patrick Witt is, and at all relevant times was, an individual residing in New Prague, in the State of Minnesota.

4.      Defendant Allina Health owns or operates twelve hospitals and over ninety clinics throughout the state of Minnesota under the name Allina Health, as well as St. Francis Regional Medical Center. Defendant Allina Health is a domestic corporation incorporated in the State of Minnesota. Allina Health is a provider of healthcare services and maintains a corporate headquarters at 2925 Chicago Ave, Mail Route 10905, Minneapolis, Minnesota 55407.

5.      Defendant is a covered entity under HIPAA.

## NATURE OF THE ACTION

6.      Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.

7.      Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

8.      The need for data privacy, security and transparency is particularly acute when it comes to the rapidly expanding world of digital telehealth providers; of all the information the

average internet user shares with technology companies, health data is some of the most extensive, valuable and controversial.[2]

9.    Plaintiffs bring this class action lawsuit to address Defendant's illegal and widespread practice of disclosing its patients confidential personally identifiable information ("PII") and protected health information ("PHI" and collectively with PII, "Private Information") to unauthorized third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta") and Google LLC ("Google").

***Defendant Allina Health System***

10.    Defendant Allina Health operates, controls and manages twelve hospitals and over ninety clinics across Minnesota.[3]

11.    Defendant Allina Health owns, controls and maintains the Websites www.allinahealth.org, https://www.stfrancis-shakopee.com/, and its webpages (the "Web Properties"), which it encourages its patients to use to, among other things, (i) book appointments, and (ii) locate the nearest Allina Health or St Francis facility. The Websites also includes a MyChart patient portal (the "Portal"), which existing patients are required to use to (i) pay bills, (ii) request prescriptions, (iii) view lab results, (iv) exchange messages with their providers, (v) fill out web forms regarding sensitive medical information, and (vi) request medical records.[4]

12.    Defendant's unlawful privacy violations occurred and continue to occur because of the tracking technologies that it installed on its Websites including, but not limited to, the Meta

---

[2] Protected and highly sensitive medical information collected by telehealth companies includes many categories from intimate details of an individual's conditions, symptoms, diagnoses and treatments to personally identifying information to unique codes which can identify and connect individuals to the collecting entity. *See* Molly Osberg & Dhruv Mehrotral, *The Spooky, Loosely Regulated World of Online Therapy*, JEZEBEL (Feb. 19, 2020), https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137 (last visited June 13, 2024).

[3] *See* https://www.allinahealth.org/about-us

[4] *See* https://account.allinahealth.org/dashboard/index

Pixel (the "Pixel"), Google Analytics and Google Tag Manager (collectively, "Tracking Technologies").[5]

13.    The Tracking Technologies that Defendant used allowed unauthorized third parties to intercept the contents of patient communications, view patients' Private Information, mine it for purposes unrelated to the provision of healthcare and further monetize it to deliver targeted advertisements, among other things.

14.    In doing so, and by designing its Websites in the manner described throughout this Complaint, Allina Health knew or should have known that its patients would use the Websites to communicate Private Information in conjunction with obtaining and receiving medical services from it.

15.    Operating as designed and as implemented by Defendant, the Pixel allowed the Private Information that Plaintiffs and Class Members submitted to Defendant to be unlawfully disclosed to Facebook alongside their unique and persistent Facebook ID, IP address and other static personal identifiers in violation of HIPAA, state laws, industry standards and patient expectations.

16.    By installing Tracking Technologies, including the Pixel, on its Websites, Defendant effectively planted a bug on Plaintiffs' and Class Members' web browsers that caused their communications to be intercepted, accessed, viewed and captured by third parties in real time, as they were communicated by patients based on Defendant's chosen parameters.

17.    Plaintiffs and Class Members used Defendant's Websites to submit information related to their past, present or future health conditions, including, for example, searches for

---

[5] This Complaint contains images and evidence demonstrating the Meta Pixel was used on Defendant's Websites, but Plaintiffs (without the benefit of discovery) do not have access to every tracking tool that was previously installed on the Websites.

treatment and the booking of medical appointments. Such Private Information would allow a third party, such as Facebook or Google, to know that a specific patient was seeking confidential medical care from Defendant as well as the type of medical care being sought.

18.     Simply put, the health information disclosed through the Tracking Technologies is personally identifiable.

19.     Defendant is a healthcare entity and thus its disclosure of health and medical communications is tightly regulated. HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider may disclose a person's personally identifiable protected health information to a third party without express written authorization.

20.     Healthcare patients simply do not anticipate or expect that their trusted healthcare provider will send personal health information or confidential medical information collected via its webpages to a hidden third party—let alone Facebook and Google, which both have a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without the patients' consent. Neither Plaintiffs nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or Google.

21.     And as noted by the Honorable William J. Orrick in a decision concerning the use of the Facebook Pixel by healthcare organizations,

> Our nation recognizes the importance of privacy in general and health information in particular: the safekeeping of this sensitive information is enshrined under state and federal law. The allegations against Meta are troubling: Plaintiffs raise potentially strong claims

on the merits and their alleged injury would be irreparable if proven.[6]

22.    Consequently, Plaintiffs brings this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein, to enjoin Defendant from making similar disclosure of its patients' Private Information in the future, and to fully articulate, *inter alia*, the specific Private Information it disclosed to third parties and to identify the recipients of that information.

23.    Defendant breached its statutory and common law obligations to Plaintiffs and Class Members by, *inter alia*: (i) failing to remove or disengage technology that was known and designed to share web-users' information; (ii) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Facebook, Google or others; (iii) failing to take steps to block the transmission of Plaintiffs' and Class Members' Private Information through Tracking Technologies like the Facebook Pixel or Google Analytics; (iv) failing to warn Plaintiffs and Class Members and (v) otherwise failing to design, and monitor its Websites to maintain the confidentiality and integrity of patient Private Information.

24.    As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of their Private Information, (iv) statutory damages and (v) the continued and ongoing risk to their Private Information.

25.    Plaintiffs seeks to remedy these harms and brings causes of action for (i) violation of the Minnesota Health Records Act; (ii) invasion of privacy; (iii) breach of implied contract; (iv) unjust enrichment; (v) breach of fiduciary duty; (vi) breach of confidence; (vii) negligence; (viii)

---

[6] *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 783 (N.D. Cal. 2022).

violation of the Electronics Communication Privacy Act ("ECPA"); and (ix) violation of the Minnesota Unfair and Deceptive Trade Practices Act ("MUDTPA").

***Plaintiff Jacqueline Ahlers's Experiences with Defendant and Defendant's Web Properties***

26.    As a condition of receiving Defendant Allina Health's services, Plaintiff Ahlers disclosed her Private Information to Allina Health on numerous occasions, and most recently in August 2024.

27.    Plaintiff Ahlers has been a patient of Allina Health's since approximately 2018.

28.    Plaintiffs Ahlers accessed Defendant Allina Health's Websites on her phone and computer to receive healthcare services from Allina Health and at Allina Health's direction.

29.    Plaintiff Ahlers used Defendant Allina Health's Websites to request and book doctor's appointments for herself as well as communicate information related to a tumor, her adrenal insufficiency, a hormone issue, night sweats, her weight, and lab results related to the same.

30.    Plaintiff Ahlers reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

31.    However, as a result of the Meta Pixel Defendant chose to install on its Website, Plaintiff Ahler's Private Information was intercepted, disclosed, viewed, analyzed and used by unauthorized third parties.

32.    Defendant transmitted Plaintiff Ahler's Facebook ID, computer IP address and other device and unique online identifiers to Facebook. Defendant also transmitted information such as health and medical information including Plaintiff's particular health conditions, the type of medical treatment sought, patient status and the fact that Plaintiff booked medical appointments.

33.    The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to Meta can only be determined through formal discovery.

34.    Plaintiffs Ahlers has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case and has had an active Facebook account since approximately 2009.

35.    Plaintiffs Ahlers never consented to the disclosure of or use of her Private Information by third parties or to Defendant enabling third parties, including Facebook and Google, to access or interpret such information. Plaintiffs Ahlers never consented to any third party's receipt or use of her Private Information.

36.    Notwithstanding, through the Tracking Technologies embedded on Defendant's Website, Defendant transmitted Plaintiff's Private Information to, at a minimum, Facebook and likely many other third parties like Google, Bing and others.

37.    As a result, Plaintiff received targeted advertisements on Facebook.

38.    Plaintiff Ahlers received targeted advertisements inviting her to visit other Allina Health locations as well as advertisements related to weight loss and a cooling mattress to alleviate night sweats.

39.    Plaintiff Ahlers would not have utilized Defendant's medical services and/or used its Website or would have paid much less for Defendant's services had she known that her Private Information would be captured and disclosed to third parties like Facebook and Google without her consent.

40.    By making these disclosures without her consent, Defendant breached Plaintiff's privacy and unlawfully disclosed their Private Information.

41.    Defendant did not inform Plaintiff that it had shared their Private Information with Facebook.

42.    Plaintiff Ahlers has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

43.    Through its use of the Meta Pixel and other tracking technologies, Defendant disclosed to Facebook:

    a.  the pages and content Ms. Ahlers viewed;

    b.  Ms. Ahlers's seeking medical treatment;

    c.  Ms. Ahlers's status as a patient;

    d.  information regarding Ms. Ahlers's patient portal activity;

    e.  the specialties of the medical providers Ms. Ahlers searched for and viewed;

    f.  the names of the medical providers Ms. Ahlers searched for and viewed;

    g.  the search results that Ms. Ahlers clicked on;

    h.  the medical services Ms. Ahlers viewed; and,

    i.  Ms. Ahlers's identity via her IP addresses and/or "c_user" cookie and/or Facebook ID.

44.    By failing to receive the requisite consent, SFR breached confidentiality and unlawfully disclosed Ms. Ahlers's Private Information.

45.    As a result of Defendant's Disclosure of Ms. Ahlers's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Ms. Ahlers has suffered the following injuries:

    a.  Loss of privacy; unauthorized disclosure of her Private Information; unauthorized

access of his Private Information by third parties;

b.  Ms. Ahlers now receives targeted health-related advertisements on Facebook and elsewhere online, reflecting her private medical treatment information;

c.  Ms. Ahlers paid Defendant for medical services and the services she paid for included reasonable privacy and data security protections for her Private Information, but Ms. Ahlers did not receive the privacy and security protections for which she paid, due to Defendant's Disclosures;

d.  The portion of Defendant's revenues and profits attributable to collecting Ms. Ahlers's Private Information without authorization and sharing it with third parties;

e.  The portion of Defendant's savings in marketing costs attributable to collecting Ms. Ahlers's Private Information without authorization and sharing it with third parties;

f.  The portion of Defendant's revenues and profits attributable to serving and monetizing advertisements directed to Ms. Ahlers as a result of collecting her Private Information without authorization and sharing it with third parties;

g.  Value to Ms. Ahlers of surrendering her choice to keep her Private Information private and allowing Defendant to track her data. The amount of these damages can be based on a baseline monthly compensation provided to participants in a Google consumer research study, the Ipsos Screenwise Panel where the baseline compensation to participants was $3 per device per month;

h.  Embarrassment, humiliation, frustration, and emotional distress;

i.  Decreased value of Ms. Ahlers's Private Information;

j.  Lost benefit of the bargain;

k.  Increased risk of future harm resulting from future use and disclosure of her Private

Information; and

l.    Statutory damages.

***Plaintiff Cathy Gebhardt-Lally's Experience***

46.    Plaintiff Cathy Gebhardt-Lally ("Ms. Gebhardt-Lally") has been a patient of SFR for approximately forty years.

47.    Ms. Gebhardt-Lally has received various healthcare services from SFR including primary care, emergency care/urgent care and physical therapy.

48.    Ms. Gebhardt-Lally used SFR's Website and Online Platforms beginning on or around 2012 and last on or around February 2024. Ms. Gebarrdt-Lally used Defendant's Website and Online Platforms approximately once a week during this timeframe.

49.    Ms. Gebhardt-Lally used the Website and Online Platforms, *inter alia*, to schedule appointments, pay medical bills, and find a primary care doctor.

50.    Ms. Gebhardt-Lally used Defendant's MyChart patient portal to message her doctors and view test results.

51.    Ms. Gebhardt-Lally also used the Website's Search bar to search for specific doctors and treatment information, including the following search terms: "Bariatric," "Sleep apnea," and "Endocrinology."

52.    After Ms. Gebhardt-Lally used the Online Platforms, she received tailored advertisements for sleep apnea therapy, other sleep apnea treatments, sleeping devices, and for weight loss products.

53.    Ms. Gebhardt-Lally relied on Defendant's Website and Online Platforms to communicate confidential patient information.  She discovered that Defendant was unauthorizedly disclosing her Private Information to Facebook via the Meta Pixel and other trackers in February

2024.

54.     Ms. Gebhardt-Lally accessed Defendant's Online Platforms at SFR's direction and encouragement in relation to her past, present, and future health and healthcare needs.

55.     Ms. Gebhardt-Lally reasonably expected that her online communications with Defendant were confidential, solely between herself and Defendant, and that, as such, those communications would not be transmitted to or intercepted by a third party.

56.     Ms. Gebhardt-Lally provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's Privacy Policy and the law.

57.     On information and belief, through its use of the Meta Pixel and other tracking technologies, Defendant disclosed to Facebook:

    a.   the pages and content Ms. Gebhardt-Lally viewed;

    b.   Ms. Gebhardt-Lally's seeking medical treatment;

    c.   Ms. Gebhardt-Lally's status as a patient;

    d.   information regarding Ms. Gebhardt-Lally's patient portal activity;

    e.   the specialties of the medical providers Ms. Gebhardt-Lally searched for and viewed;

    f.   the names of the medical providers Ms. Gebhardt-Lally searched for and viewed;

    g.   the search results that Ms. Gebhardt-Lally clicked on;

    h.   the medical services Ms. Gebhardt-Lally viewed; and,

    i.   Ms. Gebhardt-Lally's identity via her IP addresses and/or "c_user" cookie and/or Facebook ID.

58.     By failing to receive the requisite consent, SFR breached confidentiality and unlawfully disclosed Ms. Gebhardt-Lally's Private Information.

59.     As a result of Defendant's Disclosure of Ms. Gebhardt-Lally's Private Information

via the Meta Pixel and other tracking technologies to third parties without authorization, Ms. Gebhardt-Lally has suffered the following injuries:

a. Loss of privacy; unauthorized disclosure of her Private Information; unauthorized access of his Private Information by third parties;

b. Ms. Gebhardt-Lally now receives targeted health-related advertisements on Facebook and elsewhere online, reflecting her private medical treatment information;

c. Ms. Gebhardt-Lally paid Defendant for medical services and the services she paid for included reasonable privacy and data security protections for her Private Information, but Ms. Gebhardt-Lally did not receive the privacy and security protections for which she paid, due to Defendant's Disclosures;

d. The portion of Defendant's revenues and profits attributable to collecting Ms. Gebhardt-Lally's Private Information without authorization and sharing it with third parties;

e. The portion of Defendant's savings in marketing costs attributable to collecting Ms. Gebhardt-Lally's Private Information without authorization and sharing it with third parties;

f. The portion of Defendant's revenues and profits attributable to serving and monetizing advertisements directed to Ms. Gebhardt-Lally as a result of collecting her Private Information without authorization and sharing it with third parties;

g. Value to Ms. Gebhardt-Lally of surrendering her choice to keep her Private Information private and allowing Defendant to track her data. The amount of these damages can be based on a baseline monthly compensation provided to participants in a Google consumer research study, the Ipsos Screenwise Panel where the baseline

compensation to participants was $3 per device per month;

h.  Embarrassment, humiliation, frustration, and emotional distress;

i.  Decreased value of Ms. Gebhardt-Lally's Private Information;

j.  Lost benefit of the bargain;

k.  Increased risk of future harm resulting from future use and disclosure of her Private Information; and

l.  Statutory damages.

***Plaintiff Patrick Witt's Experience***

60.     Plaintiff Patrick Witt ("Mr. Witt") has been a patient of SFR for approximately twenty years.

61.     Mr. Witt has received various healthcare services from SFR including for podiatry services.

62.     Mr. Witt used SFR's Website and Online Platforms beginning on or around 2014 and last on or around July 2023. Mr. Witt used Defendant's Website and Online Platforms multiple times per year during this timeframe.

63.     Mr. Witt used the Website and Online Platforms, *inter alia*, to schedule appointments, research topics related to podiatry, and to find a podiatrist.

64.     After Mr. Witt used the Online Platforms, he received tailored advertisements on his Facebook feed and elsewhere online for podiatry services and other services related to his health.

65.     Mr. Witt relied on Defendant's Website and Online Platforms to communicate confidential patient information.  He discovered that Defendant was unauthorizedly disclosing her Private Information to Facebook via the Meta Pixel and other trackers in July 2023.

66.     Mr. Witt accessed Defendant's Online Platforms at SFR's direction and encouragement in relation to his past, present, and future health and healthcare needs.

67.     Mr. Witt reasonably expected that his online communications with Defendant were confidential, solely between himself and Defendant, and that, as such, those communications would not be transmitted to or intercepted by a third party.

68.     Mr. Witt provided his Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's Privacy Policy and the law.

69.     On information and belief, through its use of the Meta Pixel and other tracking technologies, Defendant disclosed to Facebook:

    a.  the pages and content Mr. Witt viewed;

    b.  Mr. Witt's seeking medical treatment;

    c.  Mr. Witt's status as a patient;

    d.  information regarding Mr. Witt's patient portal activity;

    e.  the specialties of the medical providers Mr. Witt searched for and viewed;

    f.  the names of the medical providers Mr. Witt searched for and viewed;

    g.  the search results that Mr. Witt clicked on;

    h.  the medical services Mr. Witt viewed; and,

    i.  Mr. Witt's identity via his IP addresses and/or "c_user" cookie and/or Facebook ID.

70.     By failing to receive the requisite consent, SFR breached confidentiality and unlawfully disclosed Mr. Witt's Private Information.

71.     As a result of Defendant's Disclosure of Mr. Witt's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Mr. Witt has suffered the following injuries:

15

a. Loss of privacy; unauthorized disclosure of his Private Information; unauthorized access of his Private Information by third parties;

b. Mr. Witt now receives targeted health-related advertisements on Facebook and elsewhere online, reflecting his private medical treatment information;

c. Mr. Witt paid Defendant for medical services and the services he paid for included reasonable privacy and data security protections for his Private Information, but Mr. Witt did not receive the privacy and security protections for which he paid, due to Defendant's Disclosures;

d. The portion of Defendant's revenues and profits attributable to collecting Mr. Witt's Private Information without authorization and sharing it with third parties;

e. The portion of Defendant's savings in marketing costs attributable to collecting Mr. Witt's Private Information without authorization and sharing it with third parties;

f. The portion of Defendant's revenues and profits attributable to serving and monetizing advertisements directed to Mr. Witt as a result of collecting his Private Information without authorization and sharing it with third parties;

g. Value to Mr. Witt of surrendering his choice to keep his Private Information private and allowing Defendant to track his data. The amount of these damages can be based on a baseline monthly compensation provided to participants in a Google consumer research study, the Ipsos Screenwise Panel where the baseline compensation to participants was $3 per device per month;

h. Embarrassment, humiliation, frustration, and emotional distress;

i. Decreased value of Mr. Witt's Private Information;

j. Lost benefit of the bargain;

16

k.   Increased risk of future harm resulting from future use and disclosure of his Private Information; and

l.   Statutory damages.

## JURISDICTION & VENUE

72.   This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

73.   This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, et seq.).

74.   This Court has personal jurisdiction over Defendant because it is incorporated in Minnesota and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated in Minnesota.

75.   Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant is incorporated in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

## COMMON FACTUAL ALLEGATIONS

**A.    Allina Health Installed and Configured Facebook Tracking Technologies on its Websites.**

76.   Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[7]

---

[7] *Facebook, Meta Reports Fourth Quarter and Full Year 2021 Results*, FACEBOOK,

77.     In conjunction with its advertising business, Facebook encourages and promotes entities and Websites owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

78.     Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications and servers, thereby enabling the interception and collection of Websites visitors' activity.

79.     Specifically, the Pixel "tracks the people and type of actions they take."[8] When a user accesses a webpage hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers. Notably, this transmission does not occur unless the webpage contains the Pixel.

80.     The Pixel is customizable and programmable, meaning that the Websites owner controls which of its web pages contain the Pixel and which events are tracked and transmitted to Facebook.

81.     The process of adding the Pixel to webpages is a multi-step process that must be undertaken by the Websites owner.[9]

82.     Facebook guides the Websites owner through setting up the Pixel during the setup process. Specifically, Facebook explains that there are two steps to set up a pixel: "(1) Create your pixel and set up the pixel base code on your Websites. You can use a partner integration if one is available to you, or you can manually add code to your Websites. (2) Set up events on your

---

https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited May 23, 2024).

[8] RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited May 23, 2024).

[9] Business Help Center: How to set up and install a Meta Pixel, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited June 1, 2024).

Websites to measure the actions you care about, like making a purchase. You can use a partner integration, the point-and-click event setup tool, or you can manually add code to your Websites."[10]

83.     Aside from the various steps to embed and activate the Pixel, Websites owners, like Defendant, must also agree to Facebook's Business Tools Terms by which Facebook requires Websites owners using the Pixel to "represent and warrant" that they have adequately and prominently notified users about the collection, sharing and usage of data through Facebook's Business Tools (including the Pixel) and that websites "will not share Business Tool Data . . . that [websites] know or reasonably should know . . . includes health, financial information or other categories of sensitive information . . . ."[11]

84.     Stated differently, Plaintiffs' and Class Members' Private Information would not have been disclosed to Facebook but for Defendant's decisions to install the Pixel on its Websites.

85.     As explained in more detail below, this secret transmission to Facebook is initiated by Defendant's source code concurrently with Plaintiffs' and Class Members' communications to their intended recipient, Defendant.

**B.     Allina Health Assisted Third Parties in Intercepting Patients' Communications with its Websites and Disclosed Their Private Information to Third Parties.**

86.     Defendant's Websites are accessible on mobile devices and desktop computers and allows patients to communicate with Defendant regarding their medical care and bills.

---

[10] *Id.*

[11] *Id.*; *see also* Pratyush Deep Kotoky, *Facebook collects personal data on abortion seekers: Report* (June 16, 2022) https://www.newsbytesapp.com/news/science/facebook-collects-personaldata-on-abortion-seekers/story (quoting Facebook spokesman Dale Hogan as saying that it is "against [Facebook's] policies for websites and apps to send sensitive health data about people through [its] Business Tools") (last visited June 1, 2024).

87.    Defendant encouraged patients to use its Websites to communicate their Private Information, schedule appointments, access information about their treatments, pay medical bills and more.

88.    Despite this, Defendant purposely installed Tracking Technologies on its Websites and programmed specific webpage(s) to surreptitiously share its patients' private and protected communications, including Plaintiffs' and Class Members' PHI and/or PII, which was sent to Facebook, Google and other third parties.

89.    The Tracking Technologies followed, recorded and disseminated patients' information as they navigated and communicated with Defendant via the Websites, simultaneously transmitting the substance of those communications to unintended and undisclosed third parties.

90.    The information disseminated by the Tracking Technologies and/or intercepted by third parties constitutes Private Information including medical information patients requested or viewed, the title of any buttons clicked (such as the "Services" drop down page which identifies and communicates the specific medical conditions and treatments of a patient), the exact phrases typed into text boxes, selections made from drop-down menus or while using filtering tools and other sensitive and confidential information, the divulgence of which is and was highly offensive to Plaintiff.

91.    This is PHI because the webpages have access to "information that relates to any individual's past, present, or future health, health care, or payment for health care."[12] In this case, Plaintiffs' or a specific Class Member's past, present, or future health.

---

[12] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 20, 2024) (noting that "IIHI collected on a regulated entity's Websites or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic

92.     The information collected and disclosed by Defendant's Tracking Technologies is not anonymous and is viewed and categorized by the intercepting party on receipt.

93.     The information Facebook received via the Tracking Technologies was linked and connected to patients' Facebook profiles (via their Facebook ID or "c_user id"), which includes other PII.

94.     Similarly, Google stores users' logged-in identifier on non-Google websites in its logs. Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that Websites. Google further logs all such data (private and non-private) within the same logs and uses this data to serve personalized ads. 13

---

location, does not include specific treatment or billing information like dates and types of health care services."). This guidance was recently vacated *in part* by the Federal District Court for the Northern District of Texas due to the court finding it in part to be the product of improper rulemaking, and it is cited for reference only until the OCR updates its guidance, should it do so in the future. *See American Hosp. Ass'n v. Becerra*, 2024 WL 3075865 (S.D. Tex., Jun. 20, 2024). Notably, the Court's Order found only that the OCR's guidance regarding covered entities disclosing to third parties users' IP addresses while users navigated *unauthenticated public webpages* ("UPWs") was improper rulemaking. The Order in no way affects or undermines the OCR's guidance regarding covered entities disclosing unique personal identifiers, such as Google or Facebook identifiers, to third parties while patients were making appointments for particular conditions, paying medical bills or logging into (or using) a patient portal. *See id*. at 3-4, 31, n. 8 (vacating the OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document."). Furthermore, the FTC bulletin on the same topics remains untouched, as do the FTC's enforcement actions against healthcare providers for committing the same or similar actions alleged herein.

13 *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (order denying summary judgment and citing internal evidence from Google employees).

95.     Simply put, the health information that was disclosed via the Tracking Technologies is personally identifiable and was sent alongside other persistent unique identifiers such as the patients' IP address, Facebook ID and device identifiers.14

**C.     Allina Health's Tracking Technologies, Source Code, Interception of HTTP Requests and Transmission of HTTP Requests.**

96.     Web browsers are software applications that allow consumers to navigate the internet and exchange electronic communications, and every "client device" (computer, tablet or smart phone) has a web browser (e.g., Microsoft Edge, Google Chrome, Mozilla's Firefox, etc.).

97.     Every Websites is hosted by a computer "server" which allows the website's owner (Defendant) to display the Websites and exchange communications with the website's visitors (Plaintiffs and Class Members) via the visitors' web browser.

98.     When patients used Defendant's Websites, they engaged in an ongoing back-and-forth exchange of electronic communications with Defendant wherein their web browser communicated with Defendant's computer server—like how two telephones communicate.

99.     These communications are invisible to ordinary consumers, but one browsing session may consist of thousands of individual HTTP Requests and HTTP Responses.

100.    A patient's HTTP Request essentially asks Defendant's Websites to retrieve certain information (such as a "Find Your Location" page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons and other features that appear on the patient's screen as they navigate Defendant's Website).

---

14 *See Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1056 (N.D. Cal. 2021) (discussing how Google collects personal information and IP addresses); *see also* https://developers.facebook.com/docs/meta-pixel/ (last visited May 23, 2024).

101. Every webpage is comprised of both Markup and "source code." Source code is simply a set of instructions that commands the Websites visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

102. Defendant's Tracking Technologies were embedded in its Website's source code, which is contained in its HTTP Response. The Tracking Technologies, which were programmed to automatically track patients' communications and transmit them to third parties, executed instructions that effectively opened a hidden spying window into each patients' web browser, through which third parties intercepted patients' communications and activity.

103. For example, when a patient visits https://account.allinahealth.org/find/searchservices and selects "Addiction Care" or "Cancer Care," the patient's browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage. As depicted below, the user only sees the Markup, not Defendant's source code or underlying HTTP Requests and Responses.



*Figure 1. The image above is a screenshot taken from the user's web browser upon visiting* https://account.allinahealth.org/servicelines/892.

104.    The image above displays the Markup of Defendant's webpage. Behind the scenes, however, Tracking Technologies like the Meta Pixel and Google Analytics are embedded in the source code, automatically transmitting everything the patient does on the webpage and effectively opening a hidden spy window into the patients' browser.

**D.    Defendant Disclosed Plaintiffs' and Class Members' Private Information to Facebook and Google Using Tracking Technologies.**

105.    In this case, Defendant employed Tracking Technologies to intercept, disclose, and re-direct Plaintiffs' and Class Members' Private Information to Facebook, Google and other third parties.

106.    Defendant's source code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those

communications to Facebook and Google. These transmissions occur contemporaneously, invisibly and without the patient's knowledge.

107.    Thus, without its patients' consent, Defendant used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Facebook, Google and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

108.    The Tracking Technologies, including the Pixel, allow Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences and decrease advertising and marketing costs. However, Defendant's Websites do not rely on the Tracking Technologies to function.

109.    While seeking and using Defendant's services as a medical provider, Plaintiffs and Class Members communicated their Private Information to Defendant via its Websites.

110.    Plaintiffs and Class Members were not aware that their Private Information would be shared with third parties as it was communicated to Defendant because, amongst other reasons, Defendant did not disclose this fact.

111.    Plaintiffs and Class Members never consented, agreed, authorized or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

112.    Defendant's Tracking Technologies, including the Pixel, sent non-public Private Information to third parties like Facebook and Google, including but not limited to Plaintiffs' and Class Members': (i) status as medical patients; (ii) health conditions; (iii) medical treatments; (iv) the specific locations where the patient sought treatment and (v) specific words and phrases the

user typed into the Website's search bar, including searches for treatment and information related to their medical conditions.

113.    Importantly, the Private Information Defendant's Tracking Technologies sent to third parties included PII that allowed those third parties to connect the Private Information to a specific patient. Information sent to Facebook was sent alongside Plaintiffs' and Class Members' Facebook ID, thereby allowing individual patients' communications with Defendant and the Private Information contained in those communications to be linked to their unique Facebook accounts and therefore their identity.[15]

114.    A user's Facebook ID is linked to their Facebook profile, which contains a wide range of demographic and other information about the user including, but not limited to, location, pictures, personal interests, work history and relationship status. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access and view the user's corresponding Facebook profile.

115.    Defendant's use of Google trackers is also problematic, and other healthcare providers have sent data breach notification letters to patients who used digital platforms outfitted with these tools. Like Facebook, Google receives the contents of patients' communications alongside data that individually identifies anyone with an existing Google account such as an email address "Gmail" or YouTube account.

116.    Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (i) implemented Tracking Technologies that surreptitiously tracked, recorded and disclosed Plaintiffs' and other patients' confidential communications and Private Information; (ii) disclosed

---

[15] Defendant's Websites tracks and transmits data via first-party and third-party cookies. The c_user cookie or Facebook ID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

patients' protected information to unauthorized third parties and (iii) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

117.    By installing and implementing both the Pixel and Google Analytics, Defendant caused Plaintiffs' and Class Member's communications to be intercepted by and/or disclosed to Facebook and Google and for those communications to be personally identifiable.

118.    As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via certain webpages.

**E.    Defendant's Tracking Technologies Divulge Patient Information Via Its Websites.**

119.    If a patient uses Defendant's Websites to find care, the Websites directs them to communicate Private Information including, but not limited to, the reason (*i.e.*, the medical condition and/or symptoms) for seeking care, exact search terms entered into the search bar, the location where they sought treatment, and their patient status.

120.    Unbeknownst to the patient, this communication is sent to Facebook and other third-party entities via Defendant's Tracking Technologies, including the location a patient has selected.

121.    In the example below, the user navigated to the "Allina Health Clinic Locations" page on Defendant's Websites where the user is prompted by Defendant's Websites to find a location by inputting personal information regarding their location and medical condition:



*Figure 2. Screenshot taken from https://account.allinahealth.org/find/locationsearchby as the user searches for a location communicates information via the drop-down menus and filters.*

122.    In this instance, the user searched for a location near their home address.

123.    Unbeknownst to patients, this webpage—which is undoubtedly used to communicate Private Information for the purpose of seeking medical treatment—contains Defendant's Tracking Technologies. The image below shows the "behind the scenes" portion of the Websites that is invisible to ordinary users:



*Figure 3. Screenshot from Defendant's Websites depicting back-end network traffic which reveals that the user is searching for Allina Health locations.*

124.    Thus, without alerting the user, Defendant's Pixel sends the communications the user made via the webpage to Facebook, and the images herein confirm that the communications Defendant sends to Facebook contain the user's Private Information.



*Figure 4: Screenshot from the Network traffic report depicting the data sent to Facebook including specific user identifiers.*

125.    The first line of highlighted text, "id=433982493454763" refers to Defendant's Meta Pixel ID and confirms that it implemented the Pixel into its source code for this webpage and transmitted info to Facebook from this webpage.

126.    On the same line of text, "ev= PageView," identifies and categorizes which actions the user took on the webpage ("ev=" is an abbreviation for event, and "PageView" is the type of event). Thus, this identifies the user as having navigated to the Websites page.

127.    Under request headers, the referrer is highlighted showing that Defendant sent the information to Facebook.

128.    Finally, the highlighted text ("GET") demonstrates that Defendant's Pixel sent the user's communications, and the Private Information contained therein, alongside the user's Facebook ID (c_user ID), thereby allowing the user's communications and actions on the Websites to be linked to their specific Facebook profile.

129.    The image demonstrates that the user's Facebook ID (highlighted as "c_user=" in the image above) was sent alongside the other data.

130.    Defendant also disclosed patients' appointment booking activities. When a User clicked "Schedule visit," Defendant sent a SubscribedButtonClick event divulging to Facebook that the User clicked "Schedule visit."

131.    Defendant then sent PageView and Microdata events confirming the User loaded the "in-person care" and "visit type" pages. Once the User selected "Adult Office Visit," a page loaded asking the User to "Select a location." After inputting the User's ZIP code, the User was invited to choose from several locations, which then offered several physicians and available times. When the User clicked on the time, Defendant sent PageView, Microdata, and SubscribedButtonClick events to Facebook informing Facebook about the User's progress. Once the User chose a physician and time, the User was prompted to enter patient information and the purpose of the visit. To complete the booking process, the User clicked "Schedule appointment," at which time Defendant sent PageView, Microdata, and SubscribedButtonClick events to Facebook informing Facebook that the User successfully scheduled the appointment with Allina Health.



*Figure 5. Screenshot from Defendant's Websites depicting back-end network traffic which reveals that the user scheduled an appointment with Allina Health.*



*Figure 6: Screenshot from the Network traffic report after scheduling an appointment with Allina Health depicting the data sent to Facebook including specific user identifiers.*

132.    Defendant's Websites offers patients the option of searching for information, including treatment and diagnosis information, about their specific medical conditions, including "Cancer."[16]

133.    Defendant discloses these searches by its patients to Facebook, by sending PageView events with the long-form URL, in this case related to cancer, as illustrated below:

---

[16] *See* https://account.allinahealth.org/find/searchservices



*Figure 7. Example of users' search related to cancer.*

134.    Defendant's Tracking Technologies even track and record the exact text and phrases that a user types into the general search bar located on Defendant's homepage. In the example above, the user typed "cancer" into the search bar.

135.    That exact phrase is sent to Facebook, thereby allowing the user's medical condition to be linked to their individual Facebook account for future retargeting and exploitation. There is no legitimate reason for sending this information to Facebook.

136.    Defendant discloses when a user searches for cancer treatment close to their ZIP code:





*Figures 8-9. Example of users' search related to cancer treatment near their ZIP code.*

137.    Defendant also disclosed User activities that reveal their status as current patients. Two examples are when Users seek to access the MyChart Portal or create a new patient Portal account.

138.    Upon a User's loading of the MyChart page, Defendant informed Facebook that the User was on the page, "https://account.allinahealth.org/dashboard/" Importantly, this shows that Defendant installed its Meta Pixel directly on its Portal login page.





*Figures 10-11. Screenshot depicting a SubscribedButtonClick event sent to Facebook as a User navigated to log in to the authenticated Portal.*

139. If a User clicked "forgot username," or "forgot password," Defendant also informed

Facebook that the User was attempting to recover her username so she could log into the Portal.

140. If a User created a Portal account, Defendant informed Facebook about this, as

well.[17]

---

[17] At the time of filing this Complaint, Plaintiffs are unable to determine whether Tracking Technologies were embedded inside Defendant's MyChart Portal. However, given Defendant's use of the Meta Pixel on other pages of the Websites *including the log-in page for its patient Portal*, Plaintiffs reasonably believe and, therefore, aver upon information and good faith belief that Defendant used the Pixels to track information on its entire digital platform, including inside



*Figure 12. Screenshot depicting a PageView event sent to Facebook as a User navigated to register a new patient account to access the authenticated Portal.*

141.    In each of the examples above, the user's Websites activity and the contents of their communications are sent to Facebook alongside their PII. Several different methods allow marketers and third parties to identify individual Websites users, but the examples above demonstrate what happens when the Websites user is logged into Facebook on their web browser or device. When this happens, the Websites user's identity is revealed via third-party cookies that work in conjunction with the Pixels.

---

its MyChart Portal. *See also*, Todd Feathers, *et al.*, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022) (listing examples of hospitals that used third party trackers inside password-protected patient portals), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

142.     For example, the Pixel transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

143.     Facebook receives several cookies when Defendant's Websites transmit information via the Pixels, including the c_user cookie, the datr cookie, and the fr cookie.

144.     The fr cookie contains an encrypted Facebook ID and browser identifier.[18] Facebook, at a minimum, uses the fr cookie to identify users, and this cookie can stay on a user's Websites browser for up to 90 days after the user has logged out of Facebook.[19]

145.     At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.[20]

146.     The Pixel uses both first- and third-party cookies, and both were used on the Websites.[21]

147.     At present, the full breadth of Defendant's tracking and data-sharing practices is unclear, but evidence suggests Defendant is using additional tracking pixels and tools to transmit its patients' Private Information to additional third parties.

---

[18] Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit* (Sept. 21, 2012), p. 33, http://www.europe-v-facebook.org/ODPC_Review.pdf (last visited May 23, 2024).

[19] *Cookies & other storage technologies*, https://www.facebook.com/policy/cookies/ (last visited May 23, 2024).

[20] The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

[21] A first-party cookie is "created by the Websites the user is visiting"—in this case, Defendant's Websites. A third-party cookie is "created by a Websites with a domain name other than the one the user is currently visiting"—i.e., Facebook. The _fbp cookie is always transmitted as a first-party cookie. At a minimum, Facebook uses the fr, _fbp, and c_user cookies to link Websites visitors' data to their Facebook IDs and corresponding accounts.

148.    Defendant does not disclose that the Pixels, Google Analytics, or any other Tracking Technologies embedded in the Website's source code track, record, and transmit Plaintiffs' and Class Members' Private Information to Facebook and Google. Moreover, Defendant never received consent or written authorization to disclose Plaintiffs' and Class Members' private communications to Facebook or Google.

149.    In addition to Allina Health's central Website, Allina Health-owned SFR also disclosed Plaintiffs' and Class Members' Private Information and confidential communications to Facebook and other third parties including Google, and Microsoft, via the Meta Pixel and other tracking technologies, without Plaintiffs' and Class Members' authorization, for marketing purposes.

150.    On information and belief, the information that Defendant sent to Facebook and other technology companies included the Private Information that Plaintiffs and the Class Members submitted to Defendant's Websites and Online Platforms, including, inter alia: their browsing activities; the pages they viewed and the buttons they clicked; information concerning their statuses as patients such as patient portal activities; information concerning their medical concerns such as the providers they searched for and viewed, and the medical services they viewed; as well as their identifying information, such as IP addresses and identifying cookies.

151.    On information and belief, SFR began disclosing its patients' data at least as early as February 11, 2010 when it first installed a Google Analytics tracker.

152.    Beginning no later than February 4, 2017 SFR added a Meta Pixel with ID 1259198927499974 ("Pixel1") to its Websites.

153.    On or around December 21, 2018, SFR had enabled Automatic Setup which would cause Pixel1 to transmit Microdata and SubscribedButtonClick events in addition to PageView events, to Facebook.

154.    SFR continues to install Pixel1 today; however, SFR has Data Restrictions enabled, which reduces the scope of Pixel1's disclosures to Facebook.

155.    Accordingly, SFR has disclosed its users' data to third parties from at least as early as February 11, 2010 through the present. SFR also disclosed its patients' data to Facebook from at least as early as February 4, 2017 through the present.

156.    Prior to SFR installing Data Restrictions, which, on information and belief, occurred some time after December 21, 2018 SFR would report user details to Facebook as soon as a patient loaded its homepage.

157.    As a patient loaded SFR's homepage, SFR would send PageView and Microdata events to Facebook reporting that the user was on the page, "https://www.stfrancis-shakopee.com/."



*Figure 13.*

158.    The Microdata event further informs Facebook that the user was learning about SFR, which "ranks in the top 10% of hospitals nationwide for care and quality."

159.     As patients navigated from the homepage to other pages, SFR would continue to disclose information about patients': (i) keyword search activities; (ii) provider search activities; (iii) location search activities; (iv) service browsing activities; and (v) billing related activities.

160.     In each of the Meta Pixel events that SFR sends to Facebook, SFR includes the "c_user" cookie, which Facebook uses to identify patients using the Websites.



*Figure 14.*

161.     Facebook can therefore connect cookie data that SFR transmits with specific SFR patients. Furthermore, Facebook's "Your activity off Meta technologies" report confirms that Facebook receives the data SFR shares with Facebook.



*Figure 15.*

***SFR Disclosed Patients' Keyword Search Activities***

162.    SFR reported details of patients' search activities to Facebook as patients performed keyword searches on SFR's Websites.

163.    Patients could perform a keyword search for relevant content from SFR's homepage. Upon a patient's navigation to view the search menu, SFR would inform Facebook about the patient's action via a SubscribedButtonClick event.



*Figure 16.*

164.    The event informs Facebook that the patient loaded the search menu directly from the page titled "Home | St. Francis Regional Medical Center."

165.    SFR would continue to report information to Facebook regarding patients as patients performed keyword searches and interacted with their search results.

166.    Among the information that SFR shared about the patients was the specific keywords that patients searched for. For example, when a patient searched for the keyword, "cancer" on SFR's Websites, SFR would report that the patient searched for "query=Cancer," through a pair of PageView and Microdata events.

167.    Then, as patients loaded pages from their keyword search results, SFR would report that to Facebook as well. When the patient loaded the Cancer Care page from their cancer keyword search, for example, SFR would transmit another set of PageView and Microdata events reporting that the patient loaded the page for "services/cancer-care/" at the "St. Francis Cancer Center."



*Figure 17.*

168.     SFR would continue to disclose information about patients after they opened pages from their search results. For instance, after the patient loaded the Cancer Care page and clicked to find locations offering cancer care or to watch a video about the Cancer Center, SFR would report those activities to Facebook through SubscribedButtonClick events.

169.     The SubscribedButtonClick event sent upon the patient's click for locations reveals the patient clicked to "Find a location," while they were on the page, "Cancer care | St. Francis Regional Medical Center." This would lead to the St. Francis Cancer Center page.

170.     As the St. Francis Cancer Center page loaded, SFR would transmit a set of PageView and Microdata events disclosing the patient's navigation.



*Figure 18.*

171.     If the patient then clicked to call the St. Francis Cancer Center, SFR would report that to Facebook through a SubscribedButtonClick event, revealing the patient called

"952.428.4141," while they were viewing the page, "St. Francis Cancer Center | St. Francis Regional Medical Center."

***SFR Disclosed Patients' Provider Search Activities***

172.    SFR also informed Facebook as its patients used SFR's provider directory to find a doctor.

173.    As soon as a patient navigated to the Provider Directory page, SFR would send Facebook PageView and Microdata events reporting the patient's navigation to the page, "https://www.stfrancis-shakopee.com/provider-directory/."

174.    The Microdata event further informs Facebook that the patient was viewing "a list of providers at St. Francis Regional Medical Center."



*Figure 19.*

175.    Patients could filter the provider directory based on a variety of preferences. When a patient filtered the directory based on their preferences, SFR would report the patient's preferences to Facebook.

176.    For example, when a patient filtered the directory for: female physicians, who specialize in oncology and radiation, who practice within 20 miles of the zip code 55379, in the city of Shakopee, at the facility, St. Francis Cancer Center, who spoke Spanish, and is accepting new patients, SFR would report each of such filters to Facebook through a PageView event.



*Figure 20.*

177.    The PageView event reports that the patient was searching SFR's "provider directory," based on the filters: (i) "gender=Female," (ii) "specialty=oncology," and "Radiation%20Oncology," (iii) with the location parameters of "distanceAmount=20%&distance=55379," in the "city=Shakopee," at the "facility=St%20Francis%20Cancer%20Center," (iv) who could speak "language=Spanish," and (v) who was accepting "newpatients=true."

178.    SFR would also report the number of physicians who matched patients' criteria as they clicked to view matching providers. For example, if a patient clicked to view the results for providers who specialized in oncology and were accepting new patients, SFR would send a SubscribedButtonClick event informing Facebook that the patient clicked to "Show 6 providers," who matched their search for providers with a specialty of "specialty=Oncology," and was accepting "newpatients=true."

179.    SFR would also inform Facebook about the physicians that patients were interested in after patients performed their provider search. For instance, when the patient loaded the profile page for Claudia Baumann, MD, SFR would send a pair of PageView and Microdata events to Facebook.



*Figure 21.*

180.    Both events inform Facebook that the patient loaded the page for "providers/claudia-baumann," from their search for oncology providers who were accepting new patients. The Microdata event provides additional information about Dr. Baumann as well, including the address of Dr. Baumann's practice location.

181.    If the patient clicked to call Dr. Baumann, SFR would send a SubscribedButtonClick event to Facebook, reporting the patient's click to dial "tel:+19324282031" while they were on the profile page for Dr. Baumann.

**SFR Disclosed Patients' Location Search Activities**

182.    Just as SFR would report details of patients' keyword and provider searches to Facebook, SFR would also inform Facebook about details of patients' location searches.

183.    Upon a patients's navigation to the page for SFR's locations, SFR would transmit PageView and Microdata events reporting the patients's navigation to "https://stfrancis-shakopee.com/locations/."

184.    Patients could filter SFR's directory of locations based on parameters such as services offered and zip code. Mirroring its disclosures about patients' physician searches, SFR would likewise inform Facebook about the parameters that patients used when conducting their locations searches.

185.    For example, when a patient filtered SFR locations for those that offered cancer services near the zip code, 55379, in the city, Shakopee, SFR would send a PageView event reporting the patient was viewing SFR locations based on "query=Cancer" in "cities=Shakopee&zip=55379."



*Figure 22.*

186.    Then, SFR would continue to report patients' activities as they loaded pages from their search results. If the patient loaded the page for the St. Francis Cancer Center, for instance, SFR would send PageView and Microdata events disclosing that the patient loaded the page for "locations/st-francis-cancer-center/" from their location search results.

187.    If the patient clicked to call the St. Francis Cancer Center, SFR would also report that activity through a SubscribedButtonClick event informing Facebook the patient dialed "952.428.4131," while they were visiting the page, "St. Francis Cancer Center | St. Francis Regional Medical Center."

***SFR Disclosed Patients' Service Browsing Activities***

48

188.    SFR also disclosed information about patients as they browsed medical services offered by SFR.

189.    For example, when a patient navigated to learn about SFR's emergency room services, SFR would send a SubscribedButtonClick event, disclosing the patient's click to "Learn more" about "services/emergency-room," and PageView and Microdata events, disclosing the patient was learning about SFR's "Emergency Department."

190.    As the patient clicked to view wait times, SFR would send another SubscribedButtonClick event, reporting that the patient clicked a button labeled "See wait times for ER and urgent care," while they were on the page for "Emergency room | St. Francis Regional Medical Center."



*Figure 23.*

191.    Likewise, when a patient clicked to learn about SFR's urgent care or express care services, SFR would send more SubscribedButtonClick events. Then, as the patient loaded the page about SFR's express care appointments, SFR would send PageView and Microdata events, revealing the patient's navigation to a page about "express-care-appointments/," where they could "Schedule your Express Care appointment online."

192.    SFR would also reveal information about patients as they explored SFR medical services tailored to specific conditions.

193.    When a patient browsed SFR's birthing services, for instance, SFR would report the patients' browsing details to Facebook. As a patient loaded the Services page, and then navigated to the Birthing Services page, SFR would send a SubscribedButtonClick event, and then PageView and Microdata events to Facebook.



*Figure 24.*

194.    The SubscribedButtonClick event reveals the patient clicked to view SFR's "Services," and the PageView and Microdata events both reveal that the patient loaded the page "https://stfrancis-shakopee.com/services/birthing-services/."

195.    Once the patient was on SFR's Birthing Services page, SFR would continue to report patient activities to Facebook. For instance, if the patient clicked to call SFR's Birthing Center or navigated to a page about the Milk Depot, SFR would report details about each activity to Facebook.

196.    As a patient clicked to call the Birthing Center, SFR would send a SubscribedButtonClick event disclosing that the patient clicked to call "952-428-2062," while they were browsing the page for "Birthing services | St. Francis Regional Medical Center."

197.    When the patient loaded the Milk Depot page, SFR would transmit a pair of PageView and Microdata events, reporting the patient's navigation to a page about "birthing-services/milk-depot," with the Microdata event further divulging that the patient was learning that SFR is a "drop-off and purchase site for donated breast milk."



*Figure 25.*

198.    If the patient then clicked to email SFR about donating breast milk, SFR would send a SubscribedButtonClick event, informing Facebook the patient clicked to email "donatemilk@mnmilkbank.org."

***SFR Disclosed Patients' Billing Related Activities***

199.    SFR would also report patients' billing related activities to Facebook as well.

200.    When a patient navigated to the Patients and Visitors page and then loaded the Billing Information page, SFR would transmit a SubscribedButtonClick event and then a set of PageView and Microdata events, divulging that the patient clicked a button labeled, "Patients and visitors," and then visited the page, "https://www.stfrancis-shakopee.com/patients-and-visitors/billing-information/."



*Figure 26.*

201.    From the Billing Information page, patients could click to pay their medical bills through MyChart. SFR would inform Facebook as a patient clicked to pay their medical bills and loaded the Patient Account & MyChart page.

202.    When the patient clicked to pay their medical bills, SFR would send a SubscribedButtonClick event revealing the patient's clicked to "Pay your bill online" on the "Billing information" page.

203.    Then, as the next page loaded, SFR would send PageView and Microdata events inform Facebook that patient navigated to the page, "https://www.stfrancis-shakopee.com/patients-and-visitors/patient-account-mychart," after they viewed the page with "billing-information/" for patients and visitors.



*Figure 27.*

***Defendant Disclosed Patients' Activities on the MyChart Patient Portal***

204.    Finally, SFR also installs Google Analytics, Microsoft UET, DoubleClick Ads, and Google Tag Manager on the Allina Health/MyChart patient portal pages.

205.    For example, when a patient navigates to the "Sign in to your account | View health record" page to log into their MyChart portal, Defendant's UET tracker sends a pageLoad event of this activity to Microsoft.



*Figure 28.*

206.    On information and belief, patients' Private Information stored on Defendant's MyChart health record database is shared with Google and Microsoft via the trackers installed by Defendant as its patients use the patient portal.

207.    SFR could have chosen not to use the Meta Pixel and other tracking technology such as Google Analytics, DoubleClick Ads, and Microsoft UET or it could have configured its trackers to limit the information that it communicated to third parties, but it did not. Instead, it intentionally took advantage of these trackers' features and functions, resulting in the Disclosure of Plaintiffs' and Class Members' Private Information.

208.    SFR used and disclosed Plaintiffs' and Class Members' Private Information to Facebook, Google, and Microsoft and potentially others, for the purpose of marketing its services and increasing its profits and reducing its marketing costs.

209.    On information and belief, SFR shared, traded, or sold Plaintiffs' and Class Members' Private Information with Facebook and other third-party technology companies in exchange for improved targeting and marketing services and reduced marketing costs.

210.    Plaintiffs and the proposed Class Members never consented, agreed, authorized, or otherwise permitted SFR to intercept their communications or to use or disclose their Private Information for marketing purposes. Plaintiffs and the proposed Class Members, patients of Defendant, were never provided with any written notice that Defendant disclosed its patients' Protected Health Information to Facebook, Google, and others, nor were they provided adequate means of opting out of such disclosures. SFR nonetheless knowingly disclosed Plaintiffs' and Class Members' Private Information including Private Information to unauthorized entities.

211.    Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

212.    Furthermore, SFR actively misrepresented it would preserve the security and privacy of Plaintiffs' and Class Members' Private Information. In actuality, SFR shared data about Plaintiffs' and Class Members' activities on the Online Platforms alongside identifying details about Plaintiffs and Class Members, such as their IP addresses.

213.    By law, Plaintiffs and the Class Members are entitled to privacy in their Private Information, including Protected Health Information, and confidential communications. SFR deprived Plaintiffs and Class Members of their privacy rights when it; (1) implemented a system

54

that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential communications, Personally Identifiable Information, and Private Information, (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook and others, and (3) undertook this pattern of conduct without notifying Plaintiffs and Class Members and without obtaining their express written consent.

**F.    Defendant's Conduct Is Unlawful and Violated Industry Norms.**

> ***i. Defendant Violated its own Privacy Policies.***

214.    Defendant's Websites' Notice of Privacy Practices ("Privacy Notice") promises patients that "We have a duty to protect the privacy of your health information . . . We have a duty to follow our current Notice of Privacy Practices[, and] We will abide by the terms of the Notice."[22] Defendant's Privacy Notice further states, "We follow this Notice of Privacy Practices and the law when we use and disclose health information."[23]

215.    Defendant's Privacy Notice further outlines how Defendant may use and disclose medical information for treatment, payment, healthcare operations, disclosures to business associates (with signed business associate agreements), medical emergencies, appointment reminders, health-related benefits and services, individuals involved in patient care or payment and other special purposes when permitted or required by law.[24]

216.    However, other uses of medical information not covered by the Privacy Notice, such as marketing and retargeting require written authorization.[25]

---

[22]    *See*    https://www.allinahealth.org/customer-service/-/media/allina-health/files/customer-service/mn-and-wi-notice-of-privacy-practices.pdf (last revised Feb. 22, 2022).
[23] *Id.*
[24] *Id.*

[25] *Id.*

217.    At no point did Allina Health seek such authorization from Plaintiffs before transmitting protected health information to a third party for marketing purposes.

218.    Defendant violated its own Privacy Notice by unlawfully disclosing Plaintiffs' and Class Members' PHI to Meta (Facebook), Google, and likely other third parties without written authorization.

219.    Defendant's Privacy Notice further states that "[w]e are required to promptly notify you of a breach to your health information." [26]

220.    Defendant further violated its Privacy Notice because it never notified Plaintiffs that her protected health information had been breached by permitting Facebook and others to intercept it without her consent.

### ii. Defendant Violated HIPAA Standards.

221.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient or household member of a patient for marketing purposes without the patients' express written authorization. [27]

222.    The HIPAA Privacy Rule "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically." [28]

223.    The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media;

---

[26] *Id.*

[27] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[28] *HIPAA For Professionals*, https://www.hhs.gov/hipaa/for-professionals/index.html (last visited June 14, 2024).

maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

224. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

225. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

    A. Names;
       ***

    H. Medical record numbers;
       ***

    J. Account numbers;
       ***

    M. Device identifiers and serial numbers;

    N. Web Universal Resource Locators (URLs);

    O. Internet Protocol (IP) address numbers; … and

    R. Any other unique identifying number, characteristic, or code…; and"
       The covered entity must not "have actual knowledge that the information could be

used alone or in combination with other information to identify an individual who is a subject of the information."[29]

226. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

227. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

228. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing IIHI relating to an individual, as those terms are defined under HIPAA.

229. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

---

[29] 45 C.F.R. § 160.514.

230.    In its Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[30]

231.    HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (emphasis added).[31]

232.    The OCR addresses the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[32]

233.    The OCR Bulletin expressly provides that **"[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of**

---

[30]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited June 14, 2024).

[31]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited June 14, 2024).

[32] *See* OCR Bulletin *supra*, note 12.

**PHI to tracking technology vendors or any other violations of the HIPAA Rules**." (emphasis in original).[33]

234. As such, Defendant's actions violated HIPAA.

***iii. Defendant Violated Industry Standards.***

235. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

236. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

237. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

238. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

239. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information

[33] *See id.*

electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

### vi. IP Addresses Are PII under HIPAA.

240. In addition to patient status, medical treatment and patients' unique Facebook ID, Defendant improperly disclosed and otherwise assisted Facebook, Google and/or other third parties with intercepting Plaintiffs' and Class Members' computer IP addresses.

241. An IP address is a number that identifies the address of a device connected to the Internet.

242. IP addresses are used to identify and route communications on the Internet.

243. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

244. Facebook tracks every IP address ever associated with a Facebook user and uses that information for targeting individual homes and their occupants with advertising.

245. As to Google, over 70% of online websites use Google's visitor-tracking products, Google Analytics and Google Ad Manager.

246. Whenever a user visits a Websites that is running Google Analytics and Google Ad Manager, Google's software scripts on the Websites surreptitiously direct the user's browser to send a secret, separate message to Google's servers in California, which includes the user's IP address, the user's geolocation, information contained in Google cookies, any user-ID issued by the Websites to the user, and information about the browser the user is using.

247. Under HIPAA, an IP address is considered PII.[34]

---

[34] HIPAA defines PII to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

248.    HIPAA defines PII to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.[35]

249.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information."[36]

250.    Consequently, by disclosing Plaintiffs' and Class Members' IP addresses along with their PHI, such as making their healthcare appointments, paying their bills or requesting medication, Defendant's business practices violated HIPAA and industry privacy standards.

**G.    Plaintiffs' and Class Members' Reasonable Expectation of Privacy.**

251.    Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

252.    Indeed, at all times when Plaintiffs and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

253.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

254.    For example, a Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing

---

[35] *See* 45 C.F.R. § 164.514(2).

[36] 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[37]

255.    Personal data privacy and obtaining consent to share Private Information are material to Plaintiffs and Class Members.

256.    Plaintiffs and Class Members would not have used Defendant's Websites, would not have provided their Private Information to Defendant and would not have paid for Defendant's healthcare services or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

257.    Plaintiffs' and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Defendant's status as a healthcare provider, Defendant's common law obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification and Defendant's express and implied promises of confidentiality.

**H.    Allina Health was Enriched and Benefitted from the Use of the Tracking Technologies and Unauthorized Disclosures.**

258.    One of the primary reasons that Defendant decided to embed the Pixel and other tracking technologies on its Websites was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data in the absence of express written consent.

---

[37] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-lessconfident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited June 1, 2024).

259.    Defendant's use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.

260.    In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook and Google in the form of enhanced advertising services and more cost-efficient marketing.

261.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

262.    The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care Websites back to Facebook via the Tracking Technologies and the Pixel embedded on, in this case, Defendant's Websites.

263.    For example, when a user searches for an urgent care location on the Websites, that information is sent to Facebook. Facebook can then use its data on the user to find more users to click on an Allina Health ad and ensure that those users targeted are more likely to convert.[38]

264.    Through this process, the Pixel loads and captures as much data as possible when a user loads a telehealth Websites that has installed the Pixel. The information the Pixel captures, "includes URL names of pages visited, and actions taken—all of which could be potential examples of health information."[39]

265.    As part of its marketing campaign, Defendant re-targeted patients and potential patients to get more visitors to its Websites to use its services. Defendant did so through use of the

---

[38] *See How to Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking* (Mar. 14, 2023), https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliantand-still-get-conversion-tracking (last visited June 14, 2024).

[39] *Id.*

intercepted patient data it obtained, procured and/or disclosed in the absence of express written consent.

266.    Companies have started to warn about the potential HIPAA violations associated with using pixels and tracking technologies because many such trackers are not HIPAA-compliant or are only HIPAA-compliant if certain steps are taken.[40]

267.    For example, Freshpaint, a healthcare marketing vendor, cautioned that "Meta isn't HIPAA-compliant. They don't sign BAAs, and the Meta Pixel acts like a giant personal user data vacuum sending PHI to Meta servers," and "[i]f you followed the Facebook (or other general) documentation to set up your ads and conversion tracking using the Meta Pixel, remove the Pixel now.[41]

268.    Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[42]

269.    By utilizing the Tracking Technologies, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiffs and Class Members and violating their rights under federal and Arizona law.

---

[40] *See The guide to HIPAA compliance in analytics*, https://campaign.piwik.pro/wpcontent/ uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant) (last visited June 1, 2024).

[41] *How To Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking*, *supra*, note 38.

[42] *The complex world of healthcare retargeting* (July 10, 2023), https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting/ (last visited June 14, 2024).

I. **Plaintiffs' and Class Members' Private Information Had Financial Value.**

270. Plaintiffs' and Class Members' Private Information has economic value and Defendant's disclosures harmed Plaintiffs and Class Members.

271. Facebook regularly uses the data that it acquires to create Core and Custom Audiences as well as Lookalike Audiences and then sells that information to advertising clients.

272. Plaintiffs' and Class Members' Private Information has considerable value as highly monetizable data especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

273. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[43]

274. Various reports have been conducted to identify the value of health data. For example, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[44]

---

[43] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 Harv. L. Rev. 2055, 2056-57 (2004).

[44] *See* https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthc are%20Data.pdf (last visited June 1, 2024).

275.    Trustwave Global Security also published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[45]

276.    The value of health data has also been reported extensively in the media. For example, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[46]

277.    Similarly, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[47]

278.    Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[48]

---

[45]    *See*    https://www.imprivata.com/blog/healthcare-data-new-prize-hackers    (citing https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf) (last visited June 1, 2024).

[46]    *See*    https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited May 23, 2024).

[47] *See* https://time.com/4588104/medical-data-industry/ (last visited May 23, 2024).

[48]    VERO,    HOW    TO    COLLECT    EMAILS    ADDRESSES    ON    TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/ (last visited May 23, 2024).

279.     There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

280.     This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data.

281.     Several companies, such as Google, Nielsen, UpVoice, HoneyGain and SavvyConnect, have products through which they pay consumers for a license to track their data.[49]

282.     Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

283.     Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[50]

---

[49] *See 10 Apps for Selling Your Data for Cash*, https://wallethacks.com/apps-for-sellingyour-data/ (last visited June 1, 2024).

[50] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (last visited May 23, 2024).

284.    These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

285.    Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, it can take years to undo the damage caused.

286.    In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

287.    Defendant gave away Plaintiffs' and Class Members' communications and transactions on its Websites without permission.

288.    The unauthorized access to Plaintiffs' and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Websites users, including Plaintiffs and Class Members.

## TOLLING

289.    Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their PII and/or PHI was intercepted and unlawfully disclosed to Facebook, Google and potentially other third parties because Defendant kept this information secret. Alternatively, applicable statutes of limitations have been tolled by other applicable rules or doctrines.

## CLASS ACTION ALLEGATIONS

290.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

291.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel and other tracking technologies on Defendant's Websites.

292.    The Minnesota Sub-Class that Plaintiffs seek to represent is defined as:

> All individuals residing in the State of Minnesota whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel and other tracking technologies on Defendant's Websites.

293.    The Nationwide Class and Minnesota Sub-Class are collectively referred to as the "Class" unless otherwise and more specifically identified.

294.    Excluded from the Class are Defendant, their agents, affiliates, parents, subsidiaries, any entity in which Defendant have a controlling interest, any of Defendant's officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

295.    Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

296.    Numerosity, Fed R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Facebook, and the Class is identifiable within Defendant's records.

297.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a.    Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b.    Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c.    Whether Defendant adequately, promptly and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

d.    Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

e.    Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f.    Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

g.    Whether Plaintiffs and Class Members are entitled to actual, consequential and/or nominal damages as a result of Defendant's wrongful conduct; and

h.    Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

298. <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

299. <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

300. <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

301. <u>Policies Generally Applicable to the Class</u>. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform

relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

302.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

303.    The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

304.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

305.    Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper

notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

306.    Further, Defendant have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

307.    <u>Issue Certification</u>, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a.    Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b.    Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.    Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f.      Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE MINNESOTA HEALTH RECORDS ACT
(Minn. Stat. § 144.291, *et seq.*)

**(On Behalf of Plaintiffs, the Nationwide Class and the Minnesota Subclass)**

308.    Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth here.

309.    Under the Minnesota Health Records Act, "health record" means any information, whether oral or recorded in any form or medium that relates to the past, present, or future physical or mental health or condition of a patient; the provision of healthcare to a patient; or the past, present, or future payment of provision of healthcare to a patient. Minn. Stat. § 144.291, subd. 2(c) (the "MHRA").

310.    The Private Information of Plaintiffs and Class Members that was surreptitiously recorded and transmitted to Facebook via Defendant's Pixel and CAPI falls within the definition of "Health Records" as that term is defined by the MHRA.

311.    Plaintiffs and Class Members are "patients" as that term is defined under the MHRA at all times relevant under Minn. Stat. §144.291, subd. 2(g).

312.    Under the MHRA, it is unlawful for a third party to access a patient's health records from a provider, or a person who receives records from a provider, without the patient or the patient's legally authorized representative's consent, specific authorization in law, or a representative from a provider that holds a signed and dated consent from the patient authorizing the release. Minn. Stat. § 144.293, subd. 2(1-3).

313.    Through the Pixel and CAPI, Defendant released Plaintiffs' and Class Members' health records to Facebook.

314.    Neither Plaintiffs nor Class Members consented to have their records released via the Pixel or CAPI.

315.    Defendant's installation of the Pixel and CAPI on its Websites constitutes an "affirmative" release under Minnesota law. *See Larson v. Nw. Mut. Ins. Co.*, 855 N.W.2d 293, 302 (Minn. 2014).

316.    Under the MHRA, a provider or other person who causes an unauthorized release of a health record by negligently or intentionally releasing the health record is liable to the patient for compensatory damages, plus costs and reasonable attorneys' fees. Minn. Stat. § 144.298, subd. 2.

317.    Plaintiffs have suffered compensatory damages including, but not limited to, invasion of their privacy, loss of value of their Private Information, directed harassing and spam Facebook advertisements, and the mental and emotional anguish caused by Defendant's surreptitious recording and transmittal of their Private Information, including medical diagnoses, to Facebook.

318.    As a result of Defendant's violations of the MHRA, Plaintiffs and Class Members seek all damages authorized by law, including compensatory damages, costs, and attorneys' fees.

## COUNT II
## INVASION OF PRIVACY

**(On Behalf of Plaintiffs, the Nationwide Class and the Minnesota Subclass)**

319.    Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth here.

320. The Private Information of Plaintiffs and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

321. Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

322. Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

323. Defendant's unauthorized disclosure of Plaintiffs' and Class Members' Private Information to Facebook, a third-party social media and marketing giant, is highly offensive to a reasonable person.

324. Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' Private Information constitutes an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

325. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Defendant facilitated Facebook's simultaneous collection and exploitation of confidential communications.

326. Defendant failed to protect Plaintiffs' and Class Members' Private Information and acted knowingly when it installed the Pixel onto its Websites because the purpose of the Pixel is to track and disseminate individual's communications with the Websites for the purpose of marketing and advertising.

327. Because Defendant intentionally and willfully incorporated the Facebook Pixel into its Websites and encouraged patients to use that Websites for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

328. As a proximate result of Defendant's acts and omissions, the private and sensitive Private Information of Plaintiffs and Class Members was disclosed to a third party without authorization, causing Plaintiffs and the Class to suffer damages.

329. Plaintiffs, on behalf of themselves and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

330. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendant and still in the possession of Facebook and the wrongful disclosure of the information cannot be undone.

331. Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

332. Plaintiffs, on behalf of themselves and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

## <u>COUNT III</u>
## BREACH OF IMPLIED CONTRACT

### (On Behalf of Plaintiffs, the Nationwide Class and the Minnesota Subclass)

333.    Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth here.

334.    As a condition of utilizing Defendant's Websites and receiving services from Defendant's healthcare facilities and professionals, Plaintiffs and Class Members provided their Private Information and compensation for their medical care.

335.    When Plaintiffs and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

336.    Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

337.    Plaintiffs and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

338.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information without consent to third parties like Facebook.

339.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged in this Complaint, including, but not limited to, the loss of the benefit of their bargain and diminution in value of Private Information.

340.    Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

## COUNT IV
## UNJUST ENRICHMENT

**(On Behalf of Plaintiffs, the Nationwide Class and the Minnesota Subclass)**

341.    Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth here.

342.    Plaintiffs pleads this count in the alternative to Plaintiffs' breach of implied contract count.

343.    Defendant benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

344.    Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members.

345.    Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

346.    The benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in Minnesota and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

347.     Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

<div align="center">

**COUNT V**
**BREACH OF FIDUCIARY DUTY**

**(On Behalf of Plaintiffs, the Nationwide Class and the Minnesota Subclass)**

</div>

348.     Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth here.

349.     In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became a guardian of Plaintiffs' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiffs and Class Members: (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendant did and does store and disclose.

350.     Defendant had a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of this relationship, in particular, to keep private and not disclose the Private Information of its patients.

351.     Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to keep their Private Information confidential and by disclosing it to third parties.

352.     Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic Private Information Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1).

<div align="center">81</div>

353.     Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic Private Information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3).

354.     Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4).

355.     Defendant breached its fiduciary duties owed to Plaintiffs and Class Members violation of 45 C.F.R. § 164.308(b) by failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiffs' and Class Members' Private Information.

356.     Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic Private Information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).

357.     Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1).

358.     Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by impermissibly and improperly using and disclosing Private Information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, *et seq.*

359.    Defendant breached its duties owed to Plaintiffs and Class Members by failing to keep Private Information confidential as required by the MHRA, Minn. Stat. § 144.291, *et seq*.

360.    Defendant breached its duties owed to Plaintiffs and Class Members by failing to keep Private Information confidential as required by Minnesota's Patient Bill of Rights, Minn. Stat. § 144.651 subd. 16.

361.    Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to effectively train all members of its workforce (including 95 independent contractors) on the policies and procedures with respect to Private Information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security Private Information in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5).

362.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

363.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, as described above.

<u>**COUNT VI**</u>
**BREACH OF CONFIDENCE**

**(On Behalf of Plaintiffs, the Nationwide Class and the Minnesota Subclass)**

364.    Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth here.

365.    Medical providers have a duty to their patient to keep their patients' Private Information completely confidential. *See* Minn. Stat. § 144.651 subd. 15-16; Minn. Stat. § 144.293.

366. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Websites.

367. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Pixel and CAPI to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Private Information and the contents of such information.

368. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

369. The third-party recipients included, but may not be limited to, Facebook.

370. The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure of private information and erosion of the essential confidential relationship between the healthcare provider and the patient.

371. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

    a. Private Information that Plaintiffs and Class Members intended to remain private is no longer private;

    b. Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d.     Plaintiffs and Class Members have suffered general and compensatory damages that were proximately caused by Defendant's negligence, in an amount to be determined by a jury;

e.     Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

f.     Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

g.     Defendant's negligent actions diminished the value of Plaintiffs' and Class Members' Private Information.

<u>**COUNT VII**</u>
**NEGLIGENCE**

**(On Behalf of Plaintiffs, the Nationwide Class and the Minnesota Subclass)**

372.   Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth here.

373.   Medical providers have a duty to their patient to keep their patients' Private Information completely confidential. *See* Minn. Stat. § 144.651 subd. 15-16; Minn. Stat. § 144.293.

374.   Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Websites.

375.   Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant negligently installed the Pixel and CAPI to disclose and transmit to

third parties Plaintiffs' and Class Members' communications with Defendant, including Private Information and the contents of such information.

376.    These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

377.    The third-party recipients included, but may not be limited to, Facebook.

378.    As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

    a.    Private Information that Plaintiffs and Class Members intended to remain private is no longer private;

    b.    Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c.    Defendant eroded the essential confidential nature of the provider-patient relationship;

    d.    Plaintiffs and Class Members have suffered general and compensatory damages that were proximately caused by Defendant's negligence, in an amount to be determined by a jury;

    e.    Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

    f.    Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

    g.  Defendant's negligent actions diminished the value of Plaintiffs' and Class Members' Private Information.

<div align="center">

**COUNT VIII**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1)** *et seq.*
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**

**(On Behalf of Plaintiffs, the Nationwide Class and the Minnesota Subclass)**

</div>

379.    Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth here.

380.    326. The ECPA protects both sending and receipt of communications.

381.    327. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

382.    328. The transmissions of Plaintiffs' Private Information to Defendant via Defendant's Websites qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

383.    The transmissions of Plaintiffs' Private Information to the Virtuwell Webpage and medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

384.    **Electronic Communications**. The transmission of Private Information between Plaintiffs and Class Members and Defendant via its Websites with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

385.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

386.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

387.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    Plaintiffs' and Class Members' browsers;

b.    Plaintiffs' and Class Members' computing devices;

c.    Defendant's web-servers; and

d.    The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications.

388.    Whenever Plaintiffs and Class Members interacted with Defendant's Websites, Defendant, through the Pixel imbedded and run on its Websites, contemporaneously and intentionally disclosed, and endeavored to disclose, the contents of Plaintiffs' and Class Members' electronic communications to third parties, including Facebook, without authorization or consent and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

389.    Whenever Plaintiffs and Class Members interacted with Defendant's Websites, Defendant, through the Pixel imbedded and run on its Websites, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiffs' and Class Members' electronic communications, for purposes other than providing health care services to Plaintiffs and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

390.    Whenever Plaintiffs and Class Members interacted with Defendant's Websites, Defendant, through the source code it imbedded and ran on its web properties, contemporaneously and intentionally redirected the contents of Plaintiffs' and Class

391.    Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook.

392.    Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs' and Class Members' regarding Private Information, including, but not limited to, symptoms, medical conditions, physician lookup, treatment, medication, and scheduling.

393.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

394.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that

the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

395.    Defendant intentionally used the wire or electronic communications for its own business purposes, unrelated to the transactions between Plaintiffs, Class members and Defendant. Defendant specifically used the Pixel to track and utilize Plaintiffs' and Class Members' Private Information for its own gain.

396.    Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

397.    Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Pixel tracking code and/or CAPI.

398.    Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

399.    **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, violations of the Minnesota's Patient Bill of Rights, the MHRA, and invasion of privacy, among others.

400.    The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

401.    Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and

interception of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

402.    Defendant's acquisition of patient communications that were used and disclosed to Facebook was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Minnesota, including: a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

      a.    Criminal violation of Minnesota's Unauthorized Computer Access statute (Minn. Stat. § 609.891);

      b.    Violation of the Minnesota's Patient's Bill of Rights, Minn. Stat. § 144.651, subd. 16;

      c.    Violation of MHRA, Minn. Stat. § 144.291, *et seq*.;

      d.    Violation of the Minnesota Unfair Deceptive Trade Practices Act ("MUDPTA") Minn. Stat. § 235D.43-48; and

      e.    Invasion of Privacy.

403.    Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

404.    The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

405.    Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

      a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

91

b.  Disclosed individually identifiable health information to Facebook without patient authorization.

406.    Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

407.    Under Minn. Stat. § 609.891, a person commits the offense of unauthorized computer access if the person intentionally and without authorization attempts to or does penetrate a computer security system or electronic terminal.

408.    Defendant violated Minn. Stat. § 609.981 when its Pixel penetrated Plaintiffs' and Class Members' web browser, without their consent, and transmitted their Private Information to Facebook.

409.    Under Minnesota's Health Care Bill of Rights, Minn. Stat. § 144.651 subd. 15-16, patients have a right to privacy as it relates to their personal and medical care and shall be assured confidential treatment of their personal and medical records.

410.    Defendant violated Minnesota's Patient's Bill of Rights by disclosing Plaintiffs' and Class Members' Private Information to third parties without authorization or consent.

411.    Under MHRA, Minn. Stat. § 144.291, *et seq*., all medical records must be treated as confidential. A hospital must receive written authorization of a patient for release of medical information outside the hospital.

412.    Defendant violated the MHRA by failing to treat Plaintiffs' and Class Members' medical records as confidential and by disclosing those records to third parties outside the hospital without written authorization or consent and without an appropriate authorized purpose.

Increasing Defendant's revenues through enhanced marketing and advertising and online targeting is not an appropriate authorized purpose.

413.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their individually-identifiable patient health information on its Websites, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' individually-identifiable patient health information with Facebook, third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know were receiving their individually-identifiable patient health information, and that Plaintiffs and Class Members did not consent to receive this information.

414.    Defendant accessed, obtained, and disclosed Plaintiffs' and Class Members' Private Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

415.    As such, Defendant cannot viably claim any exception to ECPA liability.

416.    Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a.  Learning that Defendant have intruded upon, intercepted, transmitted, shared, and used their individually identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

93

b.   Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' individually identifiable patient health information without providing any value or benefit to Plaintiffs or Class Members;

c.   Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' individually identifiable patient health information, such as understanding how people use its Websites and determining what ads people see on its Websites, without providing any value or benefit to Plaintiffs or Class Members;

d.   Defendant have failed to provide Plaintiffs and Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e.   The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiffs and Class Members intended to remain private no longer private.

417.   As a result of Defendant's violation of the ECPA, Plaintiffs are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory damages, and attorneys' fees and costs.

## <u>COUNT IX</u>
## MINNESOTA UNIFORM DECEPTIVE TRADE PRACTIECE ACT ("MUDPTA") Minn. Stat. §325D.43-48

### (On Behalf of Plaintiffs and the Minnesota Subclass)

418.    Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth here.

419.    The MDUPTA prohibits deceptive trade practices in person's business, vocation, or occupation. *See* Minn. Stat. § 325D.44, subd. 1.

420.    Defendant advertised, offered, or sold goods or services in Minnesota and therefore engaged in business directly or indirectly affecting the people of Minnesota, Defendant violated Minn. Stat. § 325D.44, including, but not limited to, the following provisions: (a) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (b) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

421.    Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of their services in violation of the MDUPTA, including, but not limited to, the following: (1) promising to protect Plaintiffs' and Class Members' Private Information via its Privacy Policies and then, in fact, knowingly, transmitting Plaintiffs' and Class Members' Private Information to third parties, such as Facebook; (2) unlawfully disclosing Plaintiffs' and Class Members' Private Information to Facebook; (3) failing to disclose or omitting material facts that that Plaintiffs' and Class Members' Private Information would be disclosed to third parties; (4) failing to obtain Plaintiffs' and Class Members' consent in transmitting Plaintiffs' and Class Members' Private

Information to Facebook; and (5) knowingly violating industry and legal standards regarding the protection of Plaintiffs' and Class Members' Private Information.

422.    These actions also constitute deceptive and unfair acts or practices because Defendant knew its Websites contained the Pixel and CAPI and also knew the Pixel and CAPI would be unknown and/or not easily discoverable by Plaintiffs and Class Members.

423.    Defendant intended that Plaintiffs and Class Members rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services.

424.    Had Defendant disclosed to Plaintiffs and Class Members that its Websites were transmitting Private Information to Facebook via the Pixel and CAPI, Plaintiffs and the Class Members would not have provided their Private Information to Defendant.

425.    Defendant's wrongful practices were and are injurious to the public because those practices were part of Defendant's generalized course of conduct that applied to the Minnesota Class. Plaintiffs and the Minnesota Class have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

426.    As a result of Defendant's wrongful conduct, Plaintiffs and Class Members were injured in that they never would have provided their Private Information to Defendant, or purchased Defendant's services, had they known or been told that Defendant failed to maintain sufficient security to keep their Private Information from being taken and misused by others.

427.    As a direct and proximate result of Defendant's violations of the MDUPTA, Plaintiffs and Class Members have suffered harm, including actual instances of identity theft; loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the payments or services made to Defendant

or Defendant's customers that Plaintiffs and Class Members would not have made had they known of Defendant's inadequate data security; lost control over the value of their Private Information; unreimbursed losses relating to fraudulent charges; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen Private Information, entitling them to damages in an amount to be proven at trial.

428.    Pursuant to MDUPTA, Plaintiffs and the Class are entitled to injunctive relief and other appropriate relief, as alleged.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Ahlers, Gebhardt-Lally, and Witt on behalf of themselves and all others similarly situated, respectfully request judgment against Defendant and that this Honorable Court grant the following:

A.    an Order certifying the Class and appointing Plaintiffs and Counsel to represent such Class;

B.    equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C.    injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members:

D.    an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.    an award of attorneys' fees, costs and litigation expenses, as allowed by law;

F.      prejudgment interest on all amounts awarded and

G.      such other and further relief as this Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs Jacqueline Ahlers, Cathy Gebhardt-Lally, and Patrick Witt hereby demand that this matter be tried before a jury.

DATE: February 13, 2025                  Respectfully Submitted,

**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**

<u>*s/ Andrew Ready Tate*</u>
Andrew Ready Tate
(GA Bar # 518068)*
atate@peifferwolf.com
235 Peachtree Street NE, Suite 400
Atlanta, GA 30303
Tel: (404) 282-4806

Brandon M. Wise
(IL Bar # 6319580)*
bwise@peifferwolf.com
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
Tel: (314) 833-4825

**Johnson Becker, PLLC**
Christiaan A. van Lierop (MN Bar No. 0402854)
444 Cedar Street, Suite 1800
St. Paul, MN 55101
Tel: 612-436-1818
Email: cvanlierop@johnsonbecker.com

**STRAUSS BORELLI, PLLC**
Raina C. Borrelli, MN State Bar No. 0392127
Brittany Resch, MN State Bar No. 0397656
One Magnificent Mile
980 North Michigan Avenue, Suite 1610
Chicago, Illinois 60611
(872) 263-1100

raina@straussborrelli.com
bresch@straussborrelli.com

**COHEN & MALAD, LLP**
Lynn A. Toops*
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com

**STRANCH, JENNINGS & GARVEY, PLLC**
J. Gerard Stranch, IV*
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com


*(*pro hac vice*)

***Counsel for Plaintiffs Jacqueline Ahlers,
Cathy Gebhardt-Lally, Patrick Witt and the
Proposed Class***